Roy Glen SWINK

v.

The STATE of Texas, Appellee.

No. 63233.

Court of Criminal Appeals of Texas,
Panel No. 3.

April 8, 1981.

Rehearing Denied June 24, 1981.

---

204

Clifford W. Brown, Mike Brown, Ralph H. Brock, Lubbock, for appellant.

Joseph Thigpen, Dist. Atty., Haskell, Robert Huttash, State's Atty., Austin, for the State.

Before TOM G. DAVIS, McCORMICK and TEAGUE, JJ.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for murder. After finding appellant guilty, the jury assessed punishment at 45 years.

In his second ground of error, appellant challenges the sufficiency of the evidence to support his conviction. The court charged the jury on the law of circumstantial evidence. Appellant, sixteen years of age at the time of the offense, was convicted of having murdered his fourteen-year-old brother, Royce Swink, in Aspermont on January 24, 1978.

Wayne Swink testified that he lived in Aspermont and that appellant was his nephew. Swink was the brother of appellant's father, Herman Swink. Appellant lived one and one-half miles from Swink with his father, brother and stepmother, Ilene Swink. At approximately 4:30 a. m. on January 24, 1978, Swink heard someone knocking at his door. Swink found appellant standing on his doorstep clad only in tennis shoes and a pair of blue jeans. Appellant was excited and told Swink "that someone was in the house and someone was shooting the family." Appellant told Swink that he escaped by knocking a window out of his bedroom and jumping through the window. As Swink was preparing to go to appellant's home, appellant informed him that the door to the house was locked and that the keys could be found in the car which he had driven to Swink's home. Swink related that he noticed scratches about appellant's back and stomach as he stood shirtless in the home.

Swink gained access to appellant's home after unlocking the door. Upon entering the home, Swink noticed the body of Royce Swink in the entryway. Further inspection of the house revealed the bodies of appellant's father and stepmother. All of the victims were dead as a result of gunshot wounds.

Dr. Jarrett Williams performed autopsies upon the three victims. He stated that each victim had died as a result of either a single or multiple shotgun wound. One such wound was discovered to the body of appellant's brother, two wounds to the body of his stepmother and three or four wounds were to the body of appellant's father.

Following the discovery of the victims, appellant was taken to the hospital. Dr. Leslie Serrano testified that she treated the scratches on appellant. She stated that the scratches had been made by a sharp pointed object. There was no evidence of bleeding and no glass found in the scratches. Finally, photographs taken of the scratches depict them to be in a vertical and horizontal pattern.

Sheriff Marvin Crawford of Stonewall County was summoned to the scene of the offense by Swink. Crawford stated that upon entering the house, he noticed an open window in the kitchen area. Potted plants were situated approximately one foot in front of the window and a hanging basket was likewise in front of the window. Crawford stated that his inspection of these plants revealed no evidence of them having been disturbed in any manner. The only other window which was open in the house

was the window which had been broken out in appellant's bedroom.

Texas Ranger Marshall Brown, of the Department of Public Safety, testified that he assisted in the investigation. Brown related that in his inspection of the house he could find no signs of forced entry and nothing of value was reported to be missing from the house. There were no bloodstains on or near the broken window in appellant's bedroom. On the night of the offense, the ground had been damp. Outside the broken window, Brown could find no evidence of footprints, handprints or impressions where appellant related that he landed after jumping out of the window.

Brown stated that following a thorough inspection of the house, he could not find the expended shells used in the shotgun. A twelve gauge pump shotgun was found in appellant's closet. The gun was unloaded and wiped clean of fingerprints. The gun was found on the day of the offense and smelled as though it had cleaning solution on it. While inspecting the premises near the house, Brown saw a gasoline tank. Inside the tank, he found twenty-four shotgun shells. Seventeen of the shells had not been fired and the remaining seven had been chambered and fired.

Brown then went to the hospital and obtained the tennis shoes appellant had worn to Swink's house. He searched the car appellant had driven to Swink's home and found a pair of gloves. Brown then transported the physical evidence he had recovered to testing facilities in Dallas.

Brown interviewed appellant at the hospital in an effort to determine what had happened at the house. With regard to this interview, Brown stated:

"Q. Will you please tell the ladies and gentlemen of the jury what he told you?

"A. Okay. Said, that Roy advised that he left Aspermont around 6:15 or 6:30 p. m. going to Stamford to see his girlfriend. She was in the hospital. On the way over there, I thought somebody was following me. I got there, and I went in and told her that somebody had followed me. We sat there and talked until about 8:55 p. m. and I then left and came back to Aspermont. I got back at my house around 9:30 p. m. I went into the house and Dad was watching television. Royce was in the bed listening to his stereo. Ilene was in the bed reading. I went on to bed and went to sleep. Sometime during the night, I think it was 2:30 a. m. I got up and got a drink of water and then went back to bed. Sometime later, I woke up and heard what sounded like gunfire. I got up and put my pants on and turned the light on. I stepped into the hallway and a gunshot went off. Roy then was asked where he thought the first shot was fired, and he advised it sounded like it was in the kitchen and maybe my daddy's bedroom. I heard daddy and Ilene's voices. I remember seeing Ilene sitting up in her bed. When asked about lights being on in the bedroom, he alleged that the light was not on. When asked about other lights in the house, he alleged he thought maybe the light in the utility room was on or it could have been the yard light shining through the window. He then was asked if he heard anyone say anything, and he stated he heard Royce say, I will call an ambulance, and then I heard a shot after that. I went back to my bedroom and put my shoes and socks on and broke out the window with my right hand and crawled through and fell out. I got into my car and went to Wayne's. Roy was then asked if he heard or saw anyone or saw a car anywhere, and he alleged he did not see anyone, hear anyone or see a car when he left the house . . . ."

Allan Jones testified that he was a firearms examiner with the Dallas County Forensic Laboratory. Jones stated that

Brown delivered the shotgun and shells to him. Tests conducted on these items revealed that the spent shells found in the gas tank had been chambered in the shotgun which was found in appellant's closet.

Sallie Williams testified that she was a forensic serologist at the Southwestern Institute of Forensic Sciences in Dallas. She related that her inspection of the window screen taken from the broken window revealed no evidence of blood, tissue, or hair. Williams stated that there were splattered bloodstains on the tennis shoes which had been taken from appellant. These bloodstains were of A type blood. Evidence revealed that appellant, his brother and father had A type blood. Finally, bloodstains were also found on the gloves which had been recovered from the car appellant drove to Swink's. These bloodstains were also of A type blood.

Larry Beauchamp, an investigator with the District Attorney's office, stated that he assisted Crawford and Brown in the investigation. Beauchamp related that when the gas tank was discovered at the house, he observed a shoeprint near the tank. Beauchamp stated that in his opinion, the shoeprint was from a tennis shoe.

Royce Stanaland testified that at 3:30 a. m. on January 24, 1978, he arrived at the home of his father-in-law. The home was approximately three hundred yards from the scene of the offense. As Stanaland left his car, he heard what he described as a "popping" sound coming from the direction of the offense. He related that the sound could have been made by the discharging of a shotgun.

Betty Patton testified that she and appellant attended the same high school and dated on a "steady" basis. Patton related that on the night of January 23, 1978, she was in the hospital and was visited by appellant. Patton told appellant that she was pregnant and the couple then discussed possible marriage. Patton then testified as follows:

"Q. Betty, in your conversation with the defendant, Roy Glen Swink, concerning about what kind of family arrangements you were going to make, did you all discuss items as where you were going to live?

"A. We decided that we didn't want to live in Aspermont.

"Q. Did you discuss any financial arrangements that you might make concerning jobs or anything?

"A. No, sir.

"Q. Betty, did Roy Glen Swink at any time mention to you about any inheritance that he might receive?

"A. Yes, sir.

"Q. Who did he tell you would inherit the property of his father?

"A. Him and Royce.

"Q. Him and Royce?

"A. Uh-huh.

"Q. Did he also mention to you in connection with that, anything about insurance?

"A. Yes, sir.

"Q. What did he tell you?

"A. He just said that if anything had ever happened to his dad, that everything would be paid for."

■ A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt of the defendant. *Schershel v. State*, Tex. Cr.App., 575 S.W.2d 548; *Bryant v. State*, Tex.Cr.App., 574 S.W.2d 109. Thus proof which amounts only to a strong suspicion or mere probability is insufficient. *Ford v. State*, Tex.Cr.App., 571 S.W.2d 924. However, every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction. *Earnhart v. State*, Tex.Cr.App., 575 S.W.2d 551. Lastly, the rules of circumstantial evidence do not require that circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the facts proved and the circumstances, and the supposition that the act may have been

committed by another person must not be out of harmony with the evidence. *Sullivan v. State*, Tex.Cr.App., 564 S.W.2d 698.

In the instant case, appellant was present at the scene of the offense. There was no sign of forced entry and nothing of value was missing from the home. Although alleging that he jumped through a window, appellant knew that the door to the home was locked. There were no indentations in the area in which appellant allegedly landed on the ground. There were no bloodstains on the broken window and no glass particles in appellant's wounds which allegedly resulted from jumping through a broken window. Appellant stated that after hearing and seeing gunshots, he reentered his bedroom and put on his tennis shoes in preparation for his alleged escape. However, splattered bloodstains were found on the shoes. Those bloodstains were of A type blood similar to that of two of the victims. The victims died as a result of shotgun wounds and a freshly cleaned shotgun was found in appellant's bedroom. Shells which had been chambered in that shotgun were hidden in a tank near the house. Finally, some seven hours before the offense, appellant and his girlfriend had discussed financial arrangements in the event of marriage. Appellant was aware of the provisions of his father's will and insurance policies. He knew that if anything happened to his father and brother, he would be the beneficiary under the will and insurance policies.

We conclude that the evidence is sufficient to exclude every reasonable hypothesis except for that of appellant's guilt in murdering his brother. Appellant's second ground of error is overruled.

In his third ground of error, appellant challenges the sufficiency of the evidence on the basis that the State introduced and failed to disprove "appellant's exculpatory statement." The statement to which appellant refers was that to the effect that someone entered the home and killed the victims.

When the State introduces an exculpatory statement or confession of the defendant, it is then bound to disprove it

and failure to do so is grounds for acquittal. *Glover v. State*, Tex.Cr.App., 566 S.W.2d 636. A statement is not exculpatory unless it amounts to an admission of guilt with an assertion which would exculpate or exonerate the accused. *McCarron v. State*, Tex. Cr.App., 605 S.W.2d 589.

In *Brown v. State*, Tex.Cr.App., 475 S.W.2d 938, the defendant was convicted of murdering his parents. The Court rejected the defendant's contention concerning an alleged exculpatory statement introduced by the State and stated as follows:

"The statements referred to were those made by the appellant in his interview with the District Attorney that he came home shortly after 5 p. m. on the date in question and changed clothes and when he left his father was 'still in the fields' wearing coveralls, and that he did not know how blood had gotten on his shirt when it was shown to him.

"Exculpatory is often defined as clearing or tending to clear from alleged fault or guilt. (Citations omitted.) Even if the statements were true, it is difficult to see how statements would clear or tend to clear the appellant and entitle him to an acquittal.

"We do not view either of these statements, introduced by the State, as being exculpatory so as to require the charge requested. (Citations omitted.) As in *Gibson v. State*, 53 Tex.Cr.R. 349, 110 S.W. 41, 48, there is no admission or statement admitting the killings but seeking to justify and excuse the same. The statements were offered by the State 'as tending to show the account given by appellant was untrue, known by him to be untrue, and therefore incriminating evidence against him, in that they show an effort and scheme to shield himself from the force and effect of his presence at the scene of the homicide and other facts tending to connect him with the murder.' (Citations omitted.)" Id. at 955.

In the instant case, there was no admission by appellant to the killing which sought to justify and thus excuse same. In

the absence of an exculpatory statement, appellant's contention is not supported by the record and is accordingly without merit.

In his first ground of error, appellant contends the court erred in overruling his motion to suppress based upon an alleged illegal search and seizure. The motion was directed at virtually every item of physical evidence recovered by law enforcement officers during their investigation.

The court held a pre-trial hearing on appellant's suppression motion. At the conclusion of that hearing, the court overruled appellant's motion.

Ranger Brown testified that he and other officers conducted numerous searches of the house in which the offense had occurred. These searches were conducted on the day of the offense, January 24, 1978, through January 28, 1978. At no time was a search warrant obtained.

Beauchamp related that appellant was arrested for the instant offense on January 28, 1978. The car appellant had driven to Swink's was searched and the gloves recovered on January 31, 1978. No warrant was obtained for the search of the car.

Swink testified that his brother's will named him as executor and guardian over appellant. Swink related that he fully cooperated with the authorities in their investigation of the offense. Swink gave officers the keys to his former brother's home and told them to take anything they needed. On August 24, 1978, after he had qualified as executor, Swink gave the authorities permission to pick up the gas tank in which the shotgun shells had been hidden.

Swink testified that the car appellant had driven to his home belonged to appellant's father. Following the offense, Swink transported the car to the home of his father. On January 31, 1978, Swink told the authorities that he had no objection to their search of the car.

Appellant was visited at the hospital by various law enforcement officers on the day of the offense. The blood-splattered tennis shoes appellant had worn to Swink's home were in the hospital room in open view.

Appellant relies on *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), in support of his contention that the warrantless search of the scene of the offense was unconstitutional. In *Mincey*, the Supreme Court of the United States held that there is no "murder scene exception" to the Fourth Amendment and that the warrantless search of a defendant's apartment was not constitutionally permissible simply because a homicide had recently occurred there. In *Pearson v. State*, Tex.Cr. App., 587 S.W.2d 393, this Court concluded that the holding of *Mincey* would not be applied retroactively to a search and trial which had been conducted prior to the time of the decision in *Mincey* on June 21, 1978.

In the instant case, the complained of search was conducted some six months before the decision in *Mincey* while the trial was held six months after the decision. At the time of the search in this case, the common law "exigency rule" allowed such homicide scene investigations. See *Tocher v. State*, Tex.Cr.App., 501 S.W.2d 921; *Brown v. State*, supra; *Corbett v. State*, Tex.Cr.App., 493 S.W.2d 940. Thus, at the time officers conducted the warrantless search of the murder scene, their actions did not run afoul of the holding in *Mincey*.

In *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), the Supreme Court of the United States was confronted with the issue of whether the holding of *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), would be applied retroactively to a search made four months prior to that decision. It was noted that at the time of the search, officers were acting in reliance upon a federal statute supported by long-standing administrative regulations and continuous judicial approval. The Court ultimately concluded that the holding of *Almedia-Sanchez* would not be applied retroactively, and stated:

"The teaching of these retroactivity cases is that if ·the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'imperative of judicial integ-

rity' is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner." *United States v. Peltier*, supra at 537, 95 S.Ct. at 2317.

We conclude that the warrantless search and seizure of the premises by the officers was permissible at the time of their actions and that the holding of *Mincey* will not be applied retroactively to this case. No error is shown in the court overruling appellant's motion to suppress the items recovered in and around the house.

Appellant next challenges the warrantless seizure of his tennis shoes at the hospital. At the time officers took the tennis shoes, appellant had not been placed under arrest. The blood-stained shoes were in open view in the hospital room and given to the officers after Swink spoke to appellant and "felt like [he] consented to it." Finally, the shoes were taken after appellant had told Brown that he put the shoes on in his bedroom after witnessing shots being fired in the house.

The plain view doctrine is an exception to the warrant requirement which permits an officer to seize what he sees in plain sight or open view if he is lawfully on the premises. *Delao v. State*, Tex.Cr.App., 550 S.W.2d 289; *Clark v. State*, Tex.Cr.App., 548 S.W.2d 888. In the instant cause, the officers went to appellant's hospital room in an effort to obtain information concerning the person appellant had allegedly seen in the home. It was after appellant told the officers that he put his shoes on after witnessing the shootings, that the blood-stained shoes in open view were taken. Following appellant's version of the events in the home, it became apparent that the shoes might be evidence of the crime. Cf. *Thomas v. State*, Tex.Cr.App., 572 S.W.2d 507; *Nicholas v. State*, Tex.Cr.App., 502 S.W.2d 169.

We conclude that the tennis shoes were lawfully seized under the plain view doctrine. No error is shown in the court permitting the shoes taken in a warrantless seizure to be admitted into evidence.

Finally the appellant challenges the warrantless search of the car in which the gloves were recovered. The title to the car was in the name of appellant's father. After arriving at Swink's home on the morning of the offense, Swink drove the car back to the scene of the shootings. Following the offense, Swink transported the car to the home of his father. Swink testified that he cooperated with the authorities and allowed them to conduct the warrantless search of the automobile. At the time of the search, Swink was aware of the fact that he was named executor under the provisions of his deceased brother's will.

One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search which is conducted pursuant to consent. *Nastu v. State*, Tex.Cr.App., 589 S.W.2d 434. Such consent must be shown to be positive and unequivocal and the burden is upon the State to show by clear and convincing evidence that the consent was freely and voluntarily given. *Escamilla v. State*, Tex.Cr. App., 556 S.W.2d 796.

A third party has authority to consent to a search when he has equal control over and equal use of the premises being searched. *Swinny v. State*, Tex.Cr.App., 529 S.W.2d 70. It is a question of fact whether the consenting party has the right to use and occupy a particular area to justify his permitting officers to search that area. *Morrison v. State*, Tex.Cr.App., 508 S.W.2d 827; *Lowery v. State*, Tex.Cr.App., 499 S.W.2d 160.

We conclude that under the evidence presented in this case, Swink had obtained control over and use of the automobile in question. He was therefore in authority to consent to the warrantless search of the automobile. No error is shown in the court admitting the gloves found during the search of the car.

Appellant further relies on Tex. Family Code Ann., Sec. 51.09(a) (Supp. 1980–1981). He maintains "that the Appel-

lant, being a juvenile, could not validly waive his rights, and consent to a warrantless search of the premises and seizure of his property except in compliance with Sec. 51.09."

Sec. 51.09(a), supra, provides as follows:

"(a) Unless a contrary intent clearly appears elsewhere in this title, any right granted to a child by this title or by the constitution or laws of this state or the United States may be waived in proceedings under this title if:

"(1) the waiver is made by the child and the attorney for the child;

"(2) the child and the attorney waiving the right are informed of and understand the right and the possible consequences of waiving it;

"(3) the waiver is voluntary; and

"(4) the waiver is made in writing or in court proceedings that are recorded."

We find that appellant's reliance on Sec. 51.09, supra, is misplaced in two respects. Initially, in resolving the search questions in this case, we have not predicated our conclusions upon appellant's consent to any of the searches and seizures. Moreover, the section upon which appellant relies speaks only in terms of proceedings under Title 3 of the Family Code. The complained of actions in this cause did not occur under that title.

No error is shown in the court overruling the motion to suppress. Appellant's first ground of error is without merit.

The judgment is affirmed.