Steven Randy CARLOS aka Ronnie S.
Carlos, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–84–185 CR.

Court of Appeals of Texas,
Beaumont.

Feb. 26, 1986.

James A. DeLee, Port Arthur, for appellant.

John R. DeWitt, Asst. Crim. Dist. Atty., Beaumont, for appellee.

## OPINION

BROOKSHIRE, Justice.

In a juried proceeding, the Appellant was found guilty of murder and was assessed punishment at life imprisonment.

At some hour during the nighttime of July 23, 1983, Lila Weems, a senior citizen and retiree from the telephone company, encountered a death of violence at the hands of an intruder—one or more—in her apartment residence, at the Hatfield Manor Apartments in Port Arthur. The Port Arthur police conducted an investigation. They discovered latent fingerprints at the scene. They discovered broken items indicating violence. The general condition of the apartment showed a struggle. During that investigation, an artist or reconstruction person of the police department sketched out one, and then a second, "composite" of a person who, apparently, had talked with the deceased woman a day, or maybe two days, prior to her death. The second composite sketch or drawing was considered to be more accurate.

Officer Waylon Hughes was performing his normal patrol duties in late July, 1983. He saw the Appellant. Hughes testified that the Appellant looked like the composite from a distance. Then Hughes lost sight of him. Later, the same day, he saw someone he believed to be the same person that he had seen at an earlier hour. Hughes then proceeded with an investigatory stop. He asked the Appellant his name and address, which the Appellant gave.

Officer Hughes explained that it was customary to have shift meetings every day before he went on patrol. During the shift meetings, "beat assignments" or the area that an officer would be patrolling would be made. The officers would go over offense reports or any other incident report that had been made prior to the first shift of the day. It was at one of these shift meetings that the officer became aware that a Lila Weems had been murdered in the Hatfield Manor Apartments. As a consequence, he became aware that the police department was looking for the person who killed Weems. At one of these shift meetings, in July, 1983, he was shown the first "composite". He had just returned that day from his vacation and this was the first information he received about the Lila Weems' murder. The next day, he saw a new or second composite stating that "our artist had done in a more updated

version of the drawing". Two days later, while working the day shift, in what was called District Two (his assigned patrol district), he saw someone that looked like the composite. Since he was caught up in the traffic and because of a slow, drizzling rain, he first saw the subject near Howard's Supermarket. By the time he could get his patrol car out of the traffic and through a red light signal, he had lost the subject. Later, the same afternoon, he saw the subject again and he stopped that person, the Appellant. He asked the Appellant for some identification. The Appellant said he did not have any. The Appellant asked the officer why the "stop." The officer said crimes had been reported in the area and, since he had never seen the Appellant before, he wanted to identify him. Then, right away, the Appellant identified himself, his name being "Steven Carlos". He pointed out his own house and told the officer that the subject Appellant lived with his grandmother in a residence at 3738 Seventh Street. The two talked for about 5 or 10 minutes. Then the officer identified the person he talked with as being the same person as the Appellant in the courtroom.

The officer testified that he did not arrest the Appellant. The officer did decide that Appellant bore such a close resemblance to the composite that, at the shift change, the officer went into the station and passed this information on to Detective Woods and Detective Donahoe who were handling this particular Lila Weems investigation.

■ We decide that the close resemblance of Appellant to the second, more accurate, composite amounted to more than a suspicion on the officer's part. Under this record, we find that, whether this intrusion be classified as a stop or an arrest, it was reasonable for the officer to briefly interfere with the Appellant. There existed a legitimate State interest in crime prevention and detection. We deem there was justification for this particular intrusion upon Carlos since the police officer was able to point out specific and articulable

facts which, together with reasonable and rational inferences, warranted the stopping of the Appellant and asking his name and address. We have made this decision against an objective standard. We decide that the facts available to the officer at the relevant moment were such as to warrant and justify a man of reasonable caution and prudence in the belief that the limited action taken was appropriate. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We determine that this police officer made appropriate approaches under all the circumstances for the legitimate purpose of investigating probable criminal behavior. Officer Hughes' actions were a reasonable and relevant part of his legitimate investigative function, especially in view of the information he obtained at the daily briefing before going on patrol. *Terry v. Ohio, supra; Armstrong v. State,* 550 S.W.2d 25 (Tex.Crim.App.1976). We maintain that the officer had more than a reasonable suspicion and, considering the totality of the circumstances surrounding this incident, his conduct in stopping the Appellant and asking him his name and address were reasonable. The officer's experience and general knowledge reinforced the logic of his acts. The officer certainly had more than a mere hunch. *Armstrong v. State, supra.*

■ It is true that, later on, Detectives Donahoe and Woods went to the Appellant's residence and requested that he accompany them to the police station for the purpose of taking photographs and fingerprints. The testimony amply supports the trial judge's ruling that the Appellant did so freely and voluntarily, without duress or coercion. The Appellant was not under arrest. He could have refused to go and reentered his residence or place of abode after the officers' request. Rather, according to one version of the facts (which the trial court believed), he reentered his room, put on a shirt, completed dressing and willingly entered the police car with the two detectives. He rode to the police station where, without objection, he was photographed and fingerprinted.

The record shows that a third officer, Herbert Johnson, in the identification bureau at the police station, testified that the Appellant was quite cooperative. Johnson testified that he asked the Appellant: " 'You know why you're here?' " Appellant said: " 'Yes', they were investigating a robbery, and I said: 'Well, it involves a robbery' ". Johnson then said: " 'You don't have to give these prints. You know that?' " Appellant said: " 'Yes, he didn't have anything to hide, and he didn't care. There was no problem.' "

The Court stated, on a motion to suppress the fingerprints and photographs, that they were given voluntarily. The Court found for their admissibility on the basis of "Inevitable Discovery Doctrine" as set forth in *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Crim.App.1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982).

Appellant then contends that there was an illegal search of the Appellant's premises but cites for appellate review a recitation in court as follows:

"THE COURT: All right, I have reviewed very carefully these affidavits. The Warrant issued for bloodied hair on August twenty-third, Nineteen-eighty-three, seems more than legally sufficient to me, and the Motion to Suppress that seizure is denied.

"I am concerned about the affidavit of the Warrant issued for the defendant's residence on August first. I would ask the State to tell me wherein there is any indicia of or indication in that Warrant as to why these items are in the defendant's residence?"

This was followed by a further colloquy between the Court and the State's attorney, as well as some addresses made to Mr. DeLee to produce any additional evidence, if desired. The State contended the jewelry in question had been in the recent possession of Appellant; he having attempted to sell these items of jewelry at various places around the town.

We think a compelling and incriminating phase of the evidence took place when Appellant was served with a warrant by a uniformed officer and placed under arrest on Monday evening, August 1, 1983, at the Eagles Hall. He was immediately given the full Miranda warnings. Upon arrest, following normal procedures, Appellant was frisked and patted down. This is normally done for safety and security reasons. Appellant was wearing some blue jeans. In the right front pants pocket of Steven Randy Carlos, two necklaces were found. These necklaces were identified as the property of the victim by her sister, Clym Sisson. She said, definitely, these were two necklaces that she had seen her sister wear many times.

The State argued that the logical conclusion from this was that certain pieces of jewelry had not yet been recovered and they were probably still in the possession of the Defendant/Appellant whose residence had already been confirmed as being 3738 Seventh Street, justifying the warrant. Later, the items of jewelry were found in Appellant's residence. Apparently, the trial court reserved a final ruling and asked both the State and able defense counsel to furnish him with further authority on the point.

Three of the rings were later introduced into evidence on the basis that they were either the same or similar to those owned by Weems. A sister of the deceased, a Mrs. Sisson, testified that the State's Exhibits 16, 17 and 18 were rings that were the same or similar to the type of jewelry worn by Weems. Mrs. Sisson definitely stated: "They look very similar, yes." The State then moved to introduce them into evidence. The Court allowed that. Mr. DeLee's only objection was: "My objection is that they are the fruits of an illegal search and seizure, Your Honor."

■ As a second ground of error, Appellant vigorously argues that the trial court committed reversible error in permitting before the jury the fruits of an "illegal search of Appellant's premises". At the threshold, we must stress that the Appellant argues that the search warrant was defective. Yet, neither the search warrant

nor the supporting affidavit or affidavits were included in this record. Appellant writes in his brief:

"Although requested, a copy of this search warrant was not included in the record."

We should not review this question or issue because of a hiatus in the record.

■ The arguable fruits were 3 rings, marked and tendered into evidence as State's Exhibits. The Appellant did object, again, to the introduction of these rings, contending that they were the results of an illegal search and seizure. However, the court below admitted these 3 rings into evidence simply as being either the same rings as owned by Weems or simply similar to the ones owned by Weems. In any event, the record does not purport to show that these 3 rings were connected with the Appellant. They were merely identified and tendered into evidence as the same or similar rings. The State did not attempt to prove that they were taken from the Appellant or the Appellant's premises. We, therefore, think that the objection made below is not the correct, proper or efficacious one. The Appellant, in his brief, seems to agree that the proper, efficient and specific objection would be one based on no relevance or no materiality rather than an objection based on the illegality of the search warrant. Also, under this record, we do not perceive harm to this Appellant. Actually, the question was to Mrs. Sisson, the victim's sister:

"Q. ... Would you look at these [the 3 rings] and just tell me if they look, just the same or kind of similar to the type of jewelry?

"A. They look very similar, yes.

After a short conference at the bench, defense counsel objects:

"(DEFENSE COUNSEL): My objection is that they are fruits of an illegal search and seizure, Your Honor.

"THE COURT: Overruled. Sixteen and Seventeen and Eighteen are admitted, as tendered, which same or similar items (sic)."

The thrust of the tender of the rings, under the language used by the State's attorney and especially the language used by the Court, we think, fairly shows they were tendered as same or similar items of jewelry. They were not connected by the State to the Appellant.

■ Apparently, the Appellant's prior position, on a motion to suppress, was that the affidavit to the search warrant did not allege or show probable cause. Again, we state that the affidavit is not in the record and, hence, this incomplete record does not afford us a basis for appellate review. The record we do have does not disclose or purport to disclose that these particular 3 rings were the subject of a seizure, either legal or illegal, from anyone. Hence, it is clear that this record does not show harm to this Appellant because of the introduction into evidence of the 3 rings.

■ The Appellant has not presented a complete record on the search warrant issue. Under the state of this record, the question of whether there was an illegal search would be governed by the wording and verbage of the search warrant and the affidavit supporting that warrant. In connection with this Ground of Error No. 2, the Appellant states: "Although requested, a copy of this search warrant was not included in the record." We deem that, when the Appellant, as here, challenges the validity of a search, especially at the appellate level, it is the Appellant's duty and obligation to see that the warrant and affidavit are included in the record for appellate purposes in order that an intelligent and meaningful weighing of the alleged error can be had. Clearly, the rule seems well established that the burden and duty is upon the Appellant to include in the record the challenged affidavit supporting a search warrant. In *Rumsey v. State*, 675 S.W.2d 517 (Tex.Crim.App.1984), it is stated, at page 519:

"... [T]he burden is on the defendant to include a contested affidavit supporting an arrest warrant in the record."

In *Dusek v. State*, 467 S.W.2d 270 (Tex. Crim.App.1971), Presiding Judge Onion wrote, at page 272:

"If the appellant desired to attack the legality of his arrest and subsequent search ... it was incumbent upon him to see that the affidavits were properly in the appellate record. This he has not done; therefore, the legality of his arrest and subsequent search is not presented for review...."

*See also Haynes v. State*, 468 S.W.2d 375 (Tex.Crim.App.1971), *cert. den.* 405 U.S. 956, 92 S.Ct. 1180, 31 L.Ed.2d 233 (1972).

■ Importantly, also, is the fact that the actual exhibits, being rings placed in evidence before the jury, are not shown to be the results of a seizure or search from anyone. In candor, the Appellant concedes that the objection to the State's exhibits was not on the basis of relevance but solely on the basis of an illegal search. We deem that the failure to make an objection on the grounds that these exhibits were not relevant waived the right to complain on appeal. We think the objection at trial was meaningfully different than that urged on appeal. Hence, nothing was preserved for review. *Teague v. State*, 703 S.W.2d 199 (Tex.Crim.App.1986), by Presiding Judge Onion.

■ Also, the objection to the introduction of testimony or exhibits must be reasonably specific and accurate so as to give fair notice to the trial judge. We think that the objection made was not the correct one. The general rule has long been established that an objection to testimony should be specific and correct, necessarily referring to a particular rule of evidence which will be breached or violated by the admission of that evidence into the record before the jury. The purpose of such a requirement is dual in nature. Firstly, a specific, correct objection, citing a particular rule of evidence, enables the trial court to understand and appreciate the precise question concerning admissibility and to make an intelligent, meaningful, and sound ruling thereon. Secondly, it affords to the party proffering that piece of evidence an oppor-

tunity to correct the defect in the offer, if it is possible to do so. *Fowler v. State*, 171 Tex.Cr.R. 600, 352 S.W.2d 838 (1962). However, we additionally hold that, under the state of this record, viewed as an entirety, Appellant has not shown that this ruling of the court was so harmful to Appellant that reversible error resulted. We do not find reversible error and overrule Ground of Error No. 2.

The Appellant's final ground of error simply contends: "The evidence is insufficient to sustain a verdict." We have carefully reviewed the entire record in this case. There is a transcript designated as Volume I, consisting of 153 pages. There are an additional four volumes of evidence and testimony, being a complete transcription of the court reporter's notes. Volumes II, III and IV contain the witnesses' testimony and other matters. Volume V of the record contains numerous exhibits consisting of a number of photographs, demonstrative or real evidence, composite drawings, photographs of pieces of clothing, photographs of the victim, photograph of the Defendant/Appellant. Among other things, also, several autopsy photographs were included. Crime scene photographs were included. The State proffered seventy-two exhibits, including pen packets. There were a number of other exhibits that we have not listed. We partially agree with the Appellant that: "although there is an overwhelming amount of evidence, it must be remembered that all of it is circumstantial." The Appellant's fingerprints were found at the scene. When Appellant was arrested, he had jewelry in his possession that was identified as being very similar to or having belonged to the deceased.

Phyllis Marshall, a laboratory technician at the Jefferson County Regional Crime Laboratory, testified that she had performed extensive serology work in the past. Serology work deals with blood generally, human blood and other human body fluids, as well as human hair and non-human hair and fiber identification. She had obtained a Bachelor's Degree in Biology. She had received special training at an

F.B.I. facility in Serology. She held membership and a listing in the Histology Registry with the American Society of Clinical Pathologists. She was also a member of the Southwestern Association of Forensic Scientists. She *defined* serology as the study of human blood and other human body fluids, including semen, saliva, urine and other excretions. She identified the types of human blood. She testified concerning the "RH" factor.

She testified concerning some fingernail scrapings from underneath the victim's fingernails. As a result of her tests, she determined that these scrapings from beneath the nails of Lila Weems did contain human blood. In addition, she received and examined pieces of clothing, rugs, and other real or demonstrative evidence from the Port Arthur Police Department. She identified semen stains and blood stains on these objects. The semen stains were on a towel that was traced to the victim's apartment. Some of the blood stains were from a red blouse that was traced to the same apartment. The type of blood in the blood stains was consistent with the type of blood of the Appellant. A sample of the Appellant's blood was taken while he was in jail.

The victim's body was first discovered by the police, being under several small throw rugs that covered virtually her entire body. The victim had Group O type blood. Carlos' blood type was type A2. The Appellant was classified as a secretor. She further testified that, in the case of a secretor, this group of people secrete their blood grouping into water soluble body fluids, such as saliva and semen. Saliva was also obtained from the Appellant during his time in jail. The semen found at the apartment was consistent with Appellant's blood type and the saliva of the jailed Appellant was consistent with the blood type found at the wrecked apartment. She testified that the semen, saliva and blood samples were all from a person with "Group A" blood type. She was even more specific, stating that "Group A" is the only blood type that has sub-groups, one known as A2. She stated all of these human body fluids were consistent with Group A2. She swore that Steven Randy Carlos' blood was of Group A2.

Samples of human head hair were found on the rugs that covered the body of Lila Weems. Samples of the head hair of the Appellant were taken from him. These samples of human hair were mounted on microscope slides and carefully inspected beneath a microscope. Phyllis Marshall had taken a 2 weeks course at the F.B.I. Hair School Academy in Quantico, Virginia. She described, in some detail, the construction of the basic component parts of human hair. She testified that she made a scientific decision and she had an opinion that some of the human hairs that were collected off of a small green rug in the apartment of Weems belonged to Steven Carlos. Of course, there was much other evidence and testimony as well as additional demonstrative or real evidence. Concededly, it was circumstantial. We think it meets the test of *Carlsen v. State*, 654 S.W.2d 444 (Tex.Crim.App.1983, Opinion on Rehearing). We quote from *Carlsen*, at page 447:

"... It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. *Moore [v. State*, 640 S.W.2d 300 (Tex.Cr.App. 1982)], supra; *Autry [v. State*, 626 S.W.2d 758 (Tex.Cr.App.1982)], supra; *Swink [v. State*, 617 S.W.2d 203 (Tex.Cr. App.1981)], supra; *Flores [v. State*, 551 S.W.2d 364 (Tex.Cr.App.1977)], supra. Each fact need not point directly and independently to the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the evidence...."

In deciding whether incriminating circumstances are sufficient, each case must, and will, be tested by its own facts. *Flores v. State*, 551 S.W.2d 364 (Tex.Crim.App.1977).

*See also* the case of *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984). We quote therefrom, at page 456:

"... Thus, we have declined to accept the standard requested by appellant. In both direct and circumstantial evidence cases the reviewing court will look at all the evidence in the light most favorable to the verdict or judgment. All cases containing the language that review of the evidence "in light of the presumption that the accused is innocent" are expressly overruled."

 We have assiduously applied the standards of appellate review to the entire record in this case. We find sufficient evidence of probative force to sustain the verdict of the jury. We maintain that the standards of review are set out in the following cases: *Carlsen v. State, supra; Freeman v. State*, 654 S.W.2d 450 (Tex.Crim.App. 1983, Opinion on Rehearing); *Denby v. State*, 654 S.W.2d 457 (Tex.Crim.App. 1983, Opinion on Rehearing); *Wilson v. State*, 654 S.W.2d 465 (Tex.Crim.App. 1983, Opinion on Rehearing), and *Houston v. State, supra*. Bearing in mind the above five cases, and applying their standards to this record, we overrule the Appellant's last ground of error.

Having found no reversible error or harmful error in this case, we affirm the judgment and sentence.

AFFIRMED.