

# NUMBER 13-07-141-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ERIC JON TUELL,                                                              Appellant,

v.

THE STATE OF TEXAS,                                                          Appellee.

### On appeal from the 36th District Court
### of San Patricio County, Texas

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Vela
### Memorandum Opinion by Justice Vela

A jury found appellant, Eric Jon Tuell, guilty of one count of aggravated sexual

assault of a child[1] and three counts of indecency with a child by contact.[2]  With respect to

---

[1]*See* TEX. PENAL CODE ANN. § 22.021(a) (Vernon Supp. 2008).

[2]*See* TEX. PENAL CODE ANN. § 21.11(a)(1), (c) (Vernon 2003).

the assault count 1, the jury assessed punishment at sixteen years' imprisonment, plus a $2,500 fine. The jury assessed punishment at six years' imprisonment, plus a $2,500 fine for the indecency counts. By two issues, Tuell contends the trial court erred in denying his motion to suppress a videotape seized during the warrantless search of his home, and he challenges the factual sufficiency of the evidence to support his convictions. We affirm.

## I. Motion to Suppress

By issue one, Tuell argues the trial court erred in denying his motion to suppress a videotape seized during the warrantless search of his home in violation of the Fourth Amendment to the United States Constitution, article 1, section 9 of the Texas Constitution, and article 1.06 of the Texas Code of Criminal Procedure. We review the trial court's ruling on a motion to suppress for an abuse of discretion. *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). Under this standard, we afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the findings are based on an evaluation of credibility and demeanor. *Id*. We afford the same amount of deference to a trial court's ruling on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id*. We may review de novo mixed questions of law and fact not falling within this category. *Id*.; *see Kothe v. State,* 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004) (whether specific search or seizure was reasonable is mixed question of law and fact that is reviewed de novo). When, as here, the trial court makes no explicit findings of historical facts, the evidence must be reviewed in a light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000); *Guzman*, 955 S.W.2d at 88-9. The trial court's ruling will be upheld if it is reasonably supported by the record and is correct on any theory of the law

2

applicable to the case. *State v. Ross,* 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000).

In a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and the weight given their testimony. *State v. Ballard,* 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). As the trier of fact, the trial court may disbelieve testimony even if it is uncontroverted. *Id.* (citing *Johnson v. State,* 871 S.W.2d 744, 748 (Tex. Crim. App. 1994)).

*A. The Suppression Hearing*

*1. State's Evidence*

The State's sole witness, Rebecca Heinsen, testified that for eight or nine years, she, her daughter H.T., and Eric Jon Tuell lived in a house in Ingleside, Texas. She and Tuell lived together as husband and wife but were not legally married. "Most of the time" she paid the water and electricity bills, and "[s]ometimes" she made the house payment.

The house had a one-car detached garage, which contained the laundry room. Heinsen testified she was allowed to go into all areas of the house and that she did the laundry.

On or about February 5, 2004, Heinsen told Ingleside police that Tuell had abused her daughter. That afternoon, the police arrested him for the crime. The next day, before Heinsen had loaded up her vehicle and left town, police officers came to the house looking for evidence related to the case. Heinsen, who was at the house and in the process of moving out of it, gave police written consent to search the house. She told them "they could go wherever they wanted to go and take whatever they wanted to take." She testified the police "took some of those little movie cassettes like for the little video recorders," "some computers, some hard drives," and "some CDs." She identified State's exhibit 2 as one of the videotapes that she allowed the police to remove from the home. She had

3

previously viewed the videotape and testified that:

> it goes to the bathroom, and [her daughter] and [her daughter's] friend are getting in the bath, and she is dancing around and being silly with no clothes on. And then you hear them talking and she–you hear her say, dad, what are you doing in here, and he [Tuell] says I'm bringing you a towel. And then it goes you can see his face and his voice, and he picks up the video camera and wraps it in something and leaves the bathroom.

She said this videotape showed her daughter when she was six or seven years old.

On cross-examination, Heinsen testified the house belonged to Tuell. On February 5, 2004, she terminated her relationship with him and began moving out of the house. She continued to move out of the house on February 6, 2004. She said the videotapes "belonged to both of us" and that Tuell had bought her the camcorder for Christmas.

*2. Tuell's Evidence*

Tuell testified that he made all the payments on the house. Heinsen had a key to the house; however, she neither had a key to the garage nor free access to it. The garage doors were kept locked "[s]ometimes," but Heinsen only went to the garage "once in a while to grab something out of the dryer because she needed it immediately," and Tuell was not there. Tuell claimed that he, not Heinsen, did the laundry.

According to Tuell, the garage had a separate room or "workshop" with a door, and Heinsen did not have permission to go through that door. Tuell did not know where the police found State's exhibit 2, but he "presume[d] it was in that room" because that was where he repaired electronics. He said that "the video camera that was being talked about was a damaged item that I was trying to repair." He said that he "probably had it just trying to fix the camera." Tuell testified that Heinsen did not have permission to go into that room to obtain any tape that was in there. He denied giving State's exhibit 2 to Heinsen. He also denied giving her the camera that recorded the videotape.

4

On cross-examination, Tuell testified that Heinsen would go into the garage "just to tell me that it's time for dinner or something or somebody wanted to talk to me." When the prosecutor asked him, "Why do you suspect that . . . [State's exhibit 2] was in your workshop in the garage?", he replied, "Because that was a camera that I bought from a pawn shop that was broken, damaged, and I was trying to repair it, and it was the only tape." He stated that the videotape (State's exhibit 2) was in that camera, which shot the videotape. Tuell put that videotape in the camera "[p]robably six years ago." He said the video camera was his and that he last worked on it six years ago. When the prosecutor asked him, "You are certain State's exhibit No. 2 . . . has . . . been in that video camera in your workshop in the garage for six years?", he replied, "More than likely, yes. I can't–I'm not going to answer that a hundred percent because I can't give you a hundred percent answer, and that's what you're wanting."

James Loving, an Ingleside police officer, testified that on February 6, 2004, he and Captain David Zamora obtained Heinsen's written consent to search the home in question. Officer Loving stated that he and Captain Zamora "walked through the residence" and that he (Officer Loving) was there to help carry out any evidence. Officer Loving said that videotapes were seized, but he did not recall seizing anything from the garage. He did not know who seized State's exhibit 2 or where it was seized from.

On cross-examination, when the prosecutor asked Officer Loving, "[Y]ou're not sure if State's exhibit No. 2 is one of the things that you seized?", he replied, "I believe it is, but I'm not a hundred percent sure, no, sir." He believed that he seized videotapes from the house, but he was not one-hundred percent sure. Officer Loving did not recall taking anything from the garage. He said that Heinsen was present during the entire search.

5

*B. Applicable Law*

Both the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution protect the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; *see Garza v. State,* 137 S.W.3d 878, 885 (Tex. App.–Houston [1st Dist.] 2004, pet. ref'd) (explaining that article I, section 9 of Texas Constitution does not offer greater protection to individuals against unreasonable searches and seizures than Fourth Amendment). The United States Supreme Court has held that the Fourth Amendment generally imposes a warrant requirement for searches. *Katz v. United States,* 389 U.S. 347, 357 (1967); *see Johnson v. United States,* 333 U.S. 10, 13-14 (1948).

It is undisputed that the police did not have a warrant to search Tuell's home. However, with respect to the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's home as unreasonable per se,[3] the "co-occupant consent rule" recognizes the validity of searches with the voluntary consent of a person possessing authority. *Georgia v. Randolph*, 126 S.Ct. 1515, 1520 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). That person may be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent. *Randolph*, 126 S.Ct. at 1520 (citing *United States v. Matlock*, 415 U.S. 164, 170 (1974)). This exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. *Randolph*, 126 S.Ct. at 1520.

---

[3]*See Payton v. New York*, 445 U.S. 573, 586 (1980); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).

In *Matlock*, the defendant was arrested in the yard of a house in which he lived with a Mrs. Graff and some of her relatives and was held in a squad car parked nearby. *Matlock*, 415 U.S. at 166. When the police went to the door of this house, Mrs. Graff let them in and consented to a search of the house. *Matlock*, 415 U.S. at 166. In resolving the defendant's objection to the use of the evidence seized during the warrantless search of the house, the *Matlock* Court said that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id*. at 170.[4]

In line with *Matlock*, the court of criminal appeals has stated that:

> in order for a third person to validly consent to a search, that person must have equal control and equal use of the property searched. And we have recently emphasized that the third party's legal property interest is not dispositive in determining whether he has the authority to consent to a search, saying that "common authority derives from the mutual use of the property, not the ownership or lack thereof."

*Welch v. State*, 93 S.W.3d 50, 53 (Tex. Crim. App. 2002) (footnotes omitted). The State has the burden of establishing common authority. *Id*.

*C. Application of Law to Facts*

In order to determine whether Heinsen validly consented to the search, we must first inquire as to where the police found the videotape (State's exhibit no. 2); in the home or in Tuell's workshop within the garage? Officer Loving testified he and Captain Zamora

---

[4]The *Matlock* Court explained that:

The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinement, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) (citations omitted).

7

"walked through the residence." Officer Loving stated that videotapes were seized, but that he did not recall seizing anything from the garage. When the prosecutor asked him, "[Y]ou're not sure if State's exhibit no. 2 is one of the things that you seized?", he replied, "I believe it is, but I'm not a hundred percent sure, no, sir." Officer Loving believed that he seized videotapes from the house, but he was not one-hundred percent sure. Tuell was not one-hundred percent sure that the videotape was in his workshop at the time of the search and said his workshop was off limits to Heinsen. Based upon this evidence, the trial court, as the sole fact finder, could have found that Officer Loving seized the videotape from inside the house rather than in the workshop.

The next inquiry is whether Heinsen had equal control and equal use of the house. She and Tuell lived in the home for eight or nine years as husband and wife. She had a key to the house, and she was allowed to go into all areas of the house. Most of the time she paid the utility bills. On February 5, 2004, the day Tuell was arrested, Heinsen terminated her relationship with him and began moving out of the house. While moving out, she gave police permission to search the house. Based upon this evidence, the trial court could find that Heinsen had equal control and equal use of the house when she gave police permission to search it. Even though Tuell owned the house, Heinsen's legal property interest is not dispositive in determining whether she had the authority to consent to a search. *See Welch*, 93 S.W.3d at 53.

Furthermore, even though Heinsen was in the process of moving out of the house at the time she gave police consent to search it, the trial court could find that at the time she gave them consent to search, she still had equal access to the house. The record does not show that Tuell asked Heinsen to leave the house, or that he had restricted her access to it. Persons who have equal access to and control over premises have authority

8

to authorize a search. *Swink v. State*, 617 S.W.2d 203, (Tex. Crim. App. 1981); *Fuller v. State*, 858 S.W.2d 528, 531 (Tex. App.–Eastland 1993, pet. ref'd). Tuell, relies on *May v. State*, 780 S.W.2d 866 (Tex. App.–Dallas 1989, pet. ref'd), however, May is distinguishable. In *May*, an "estranged wife" who had moved from the defendant's house several months before the search and who was antagonistic to the defendant, gave officers permission to search the defendant's house. In addition, the evidence in *May* showed the estranged wife was working with police officers to "set up" the defendant and have him arrested. There are no such facts in the instant case.

Accordingly, the trial court could have found that Heinsen validly consented to the search of the house. *See Matlock*, 415 U.S. at 170 ("the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared"). Thus, we hold the trial court did not abuse its discretion by denying the motion to suppress. Issue one is overruled.

## II. Factual Sufficiency

By issue two, Tuell challenges the factual sufficiency of the evidence to support his convictions. In reviewing a factual sufficiency claim, we review the evidence in a neutral light rather than the light most favorable to the verdict. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)). Evidence is factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). We do not reverse for

9

factual insufficiency if the greater weight and preponderance of the evidence actually favors conviction. *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson*, 204 S.W.3d at 417).

The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault of a child or indecency with a child. *Perez v. State,* 113 S.W.3d 819, 838 (Tex. App.–Austin 2003, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005); *Tear v. State,* 74 S.W.3d 555, 560 (Tex. App.–Dallas 2002, pet. ref'd).

*A. State's Evidence*

*1. Testimony of Rebecca Heinsen*

Heinsen testified that she and her daughter, H.T., used to live with Eric Jon Tuell in Ingleside. H.T. had a friend, J.S., who would spend the night with H.T. at the Tuell home.

*2. Testimony of Kimberly Faircloth*

In 2000, Kimberly and Brian Faircloth, along with Kimberly's daughter, J.S., lived in Ingleside and were Tuell's neighbors. Tuell lived with Rebecca Heinsen, and Heinsen's daughter, H.T. J.S. and H.T. were friends and often spent the night together at each other's houses. Kimberly testified that in 2005, J.S. "broke down and she started crying and she told [Kimberly and Brian] what he [Tuell] had done to her." Afterwards, Kimberly and J.S. reported the incident to the police.

On cross-examination, Kimberly testified that J.S. told her that Tuell "had touched her in places that he shouldn't be touching her" and that Tuell "touched her in places he should not have been touching her in her private places." Tuell and Kimberly's husband, Brian, were business partners at about the time J.S. reported the abuse. After Kimberly and Brian found out what Tuell did to J.S., Brian and Tuell had a "falling out," and Brian started his own business. Kimberly knew of no reason why J.S. would be mad at Tuell.

10

*3. Testimony of J.S.*

J.S. testified that in the summer of 2001 or 2002, when she was at Tuell's home spending the night with H.T., Tuell touched her. J.S. testified that she and H.T. were taking a shower and that:

> We just had the water running, and Eric [Tuell] had said that he would bring us towels and leave them on the toilet. And as [H.T.] was getting in the shower, she was telling him to leave and then he wouldn't. And he just stayed in there when we were getting undressed, and then he took me to the room [H.T.'s bedroom]. And [H.T.] had come out, she went in the room where we were, and she had told me to leave and get back in the shower.

When Tuell took J.S. to H.T.'s bedroom, J.S. was wearing no clothes, and Tuell was wearing a pair of blue jean shorts. J.S. said that Tuell started "messing with my private area and my breasts." By private area, she meant her "crotch." When the prosecutor asked her, "And is that your sexual organ?", she replied, "Yes." Asked by the prosecutor where Tuell had touched her "crotch," she replied, "Inside, around it" and "Inside and around the outside." She said Tuell touched her with his fingers. When the prosecutor asked her, "[D]id you also say he touched your breasts?", she replied, "Yes." At that time, J.S. was eleven or twelve years old.

On another occasion when J.S. went to Tuell's house, Tuell told her that H.T. was at daycare, and he was going to pick her up. She was going to go with him, but he told J.S. to "mess with his private area." When the prosecutor asked her, "And by 'private area' do you mean his penis?", she replied, "Yes." She said he told her "to touch it, and then he was trying to stick it inside me" "[m]y private area." She said he was not able to put his private part inside of her. When the prosecutor asked her, "So at some point you did touch his private part?", she replied, "Yes." She said the abuse stopped when H.T. moved to "Aransas."

11

On cross-examination, J.S. said she did not tell anyone about what Tuell had done to her until summer 2005, about four years later. She said that H.T.'s mother was at work when these incidents happened.

*B. Tuell's Testimony*

Tuell denied doing anything to J.S. Tuell testified he had owned a karaoke service and that he fired Brian Faircloth after getting into a dispute with him. Shortly thereafter, he was accused of abusing J.S., Brian's stepdaughter.

Tuell stated that about three months prior to the time J.S. reported the abuse, he saw J.S. talking to "about four kids on top of the roof running around." He told Brian Faircloth what he had seen. Afterwards, J.S. would not speak to Tuell anymore unless she wanted to borrow something from him. Tuell testified that in 2000, he was living in Aransas Pass and that he returned to Ingleside in 2001.

*C. Applicable Law*

*1. Count 1: Aggravated Sexual Assault of a Child*

Section 22.021(a) of the penal code states a person commits an offense if he or she "(B) intentionally or knowingly:" "(i) causes the penetration of the anus or sexual organ of a child by any means;" . . . "and (2) if: . . . (B) the victim is younger than 14 years of age. . . ." TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (2)(B) (Vernon Supp. 2008).

The charge included four separate application paragraphs. In Count 1, the court instructed the jury that they will find Tuell guilty of aggravated sexual assault of a child as alleged in the indictment if they found he caused "the penetration of the sexual organ of J.S., a child who was then and there younger than 14 years of age and not the spouse of the defendant, by defendant's finger . . . ."

12

*2. Counts 2, 3, and 4:  Indecency with a Child by Contact*

The penal code provides that a person commits an offense "if, with a child younger than 17 years and not the person's spouse, . . . the person:  (1) engages in sexual contact with the child or causes the child to engage in sexual contact; . . . ."  TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2003).  Sexual contact includes the following acts, "if committed with the intent to arouse or gratify the sexual desire of any person:"  "(1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person."  TEX. PENAL CODE ANN. § 21.11(c) (Vernon 2003).

With respect to Count 2, the court instructed the jury they will find Tuell guilty of indecency with a child by contact as alleged in the indictment if they found he "with intent to arouse or gratify the sexual desire of the defendant, intentionally or knowingly engage[d] in sexual contact with J.S. by touching the genitals of J.S., [a] child who was then and there younger than 17 years of age and not the spouse of the defendant, . . . ."  With respect to Counts 3 and 4, the court charged the jury as it did in Count 2, except that in Count 3, the court instructed the jury they will find Tuell guilty if he "engage[d] in sexual contact with J.S. by touching the breast of J.S.", and in Count 4, they will find Tuell guilty if he "cause[d] J.S. . . . to engage in sexual contact by causing the said J.S. to touch the genitals of the defendant, . . . ."

In *Pizzo v. State*, the court of criminal appeals stated that the Legislature, in defining sexual contact as that term relates to indecency with a child by contact, placed limitations on the prohibited conduct by criminalizing only three specific types of acts.  235 S.W.3d 711, 717 (Tex. Crim. App. 2007).  "A person can engage in sexual contact by touching the

anus, by touching the breast, or by touching the genitals with the requisite intent. Each one of these acts represents a different offense." *Id.* Thus, the offense of indecency with a child by contact "is completed when a person commits any one of the three proscribed acts." *Id.* at 718. In other words, if a person touches the anus, breasts, and genitals of a child with the requisite intent during the same transaction, the person is criminally responsible for three separate offenses. *Id.* Accordingly, a guilty verdict is proper if sufficient evidence exists to support either mode of commission. *See Kitchens v. State,* 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

Intent is a fact question for the trier of fact, who may infer it from the acts, words, and conduct of the accused. *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999); *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). As a result of its nature, mental culpability must generally be inferred from the circumstances under which a prohibited act or omission occurs. *Hernandez*, 819 S.W.2d at 810; *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). The intent to arouse or gratify may be inferred from conduct alone and there is no requirement of an oral expression of intent. *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981); *Lozano v. State*, 958 S.W.2d 925, 930 (Tex. App.–El Paso 1997, no pet.); *Tyler v. State*, 950 S.W.2d 787, 789 (Tex. App.–Fort Worth 1997, no pet.).

*D. Analysis*

In this case, a rational jury could have found the following facts from the evidence: (1) Tuell put his finger inside J.S.'s sexual organ; (2) Tuell caused J.S. to touch his sexual organ; (3) Tuell touched J.S.'s genital area; (4) Tuell touched J.S.'s breasts; (5) J.S. was eleven or twelve years old when this conduct occurred; and (6) J.S. was not Tuell's spouse.

14

The contrary evidence was that: (1) Tuell denied doing anything to J.S.; (2) the State offered no medical evidence to show Tuell sexually assaulted J.S.; (3) J.S. had a motive to accuse Tuell of sexually assaulting her; (4) Tuell was living in Aransas County in 2000 and returned to Ingleside in 2001; and (5) according to J.S., the abuse never occurred after he moved back to Ingleside in 2001.

Viewing the evidence in a neutral light, we conclude the evidence was not so weak that the jury's determinations were clearly wrong and manifestly unjust, or that the conflicting evidence presented by Tuell so greatly outweighed the evidence supporting the convictions that the jury's determinations were manifestly unjust. *See Watson,* 204 S.W.3d at 414-15, 417; *Johnson,* 23 S.W.3d at 11. Further, a rational jury could have inferred that Tuell possessed the requisite intent to arouse or gratify his sexual desire. Therefore, deferring to the jury's determination of the weight to be given contradictory testimonial evidence, we conclude the evidence was factually sufficient to support the convictions. Issue two is overruled.

III. Conclusion

The trial court's judgment is affirmed.


ROSE VELA
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 27th day of August, 2008.

15