**Clifton Eugene BELYEU, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69654.**

Court of Criminal Appeals of Texas,
En Banc.

Sept. 27, 1989.

Rehearing Denied June 27, 1990.

Kenneth Ables, Fred Horner, Waco, for appellant.

Vic Feazell, Former Dist. Atty., Paul E. Gartner, Jr., Dist. Atty., and David Deaconson and Tonya Boyce, Asst. Dist. Attys., Waco, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of the offense of capital murder. V.T.C.A. Penal Code § 19.03. After the jury returned affirma-

tive answers to the special issues at punishment, the trial court sentenced appellant to death. Art. 37.071, V.A.C.C.P. Review by this Court is automatic. Art. 37.071(h), supra. Appellant raises five points of error on appeal. Finding no merit in these points, we will affirm appellant's conviction.

■ In his fourth point of error, appellant contends the evidence is insufficient to support his conviction. Specifically, appellant argues that this case "was tried on the theory of circumstantial evidence and by virtue of such fact the State is required to exclude every other reasonable hypothesis except that of [appellant's] guilt, *Swink v. State*, 617 S.W.2d 203 (Tex.Cr.App.1981)." The State correctly responds in its brief that the appropriate standard for appellate review of sufficiency of the evidence is the same for direct and circumstantial evidence. See *Bower v. State*, 769 S.W.2d 887 (Tex.Cr.App.1989), *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989), *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988), citing *Houston v. State*, 663 S.W.2d 455 (Tex.Cr.App.1984) (Opinion on Rehearing). That standard, announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) rehearing denied 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 and followed by this Court, is that the evidence must be viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Moreno v. State*, 755 S.W.2d 866 (Tex.Cr.App.1988). We utilize the reasonable hypothesis theory in circumstantial evidence cases in *applying* the *Jackson* standard, see *Butler*, at footnote 1, but it is not a separate standard for appellate review. The reasonable hypothesis analysis is used to determine whether the jury's guilty verdict is a rational finding given the evidence. As we stated in *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (Opinion on Reh'g), "if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding."

■ With this reviewing procedure in mind, we detail the facts in order to properly analyze appellant's point of error. On the morning of December 10, 1985, at approximately 8:30 a.m., Diane Friend visited Melody Bolton at her home in West for approximately ten minutes. Cindy Snokhouse testified that later that day, she called Melody at home. Cindy stated that she first called Melody between 10:30 and 11:00 a.m. that day and called several times because the phone was always busy. Cindy finally drove over to the Bolton residence to see Melody at 11:50 a.m. Cindy testified that Melody's car was in the garage and that the Christmas tree lights were on, but no one answered the doorbell. Concern for Melody prompted Cindy to call Melody's husband, Gerald Bolton, at work.

Gerald Bolton testified that he left his home on December 10, 1985, at approximately 7:50 a.m., took his two children to school, and then went to work at his Chevrolet dealership. Shortly before noon that day, he received a call at work from Cindy Snokhouse that something was wrong at his house because lights were on, doors were open, the car was in the garage, but no one was answering the doorbell. Three minutes later Gerald left work and went home. When Gerald arrived at his house, he noticed that some cabinets in the garage and the door to the utility room were open. Finding that unusual, he walked through the utility room into the dining room of his home and he noticed that the phone was off the hook. Gerald then noticed a mudprint on the carpet in the living room. He called out for Melody but there was no response. Knowing that something was wrong but not knowing what, Gerald called his dealership and told two friends to come out to his home.

After calling the dealership, Gerald went out to the garage to get one of his guns [1] which he kept in a cabinet. His guns were

---

**1.** Gerald testified that he owned a 30.06 deer rifle, an 1100 Remington shotgun, and a 12 gauge shotgun.

missing so he picked up his son's baseball bat for protection and went out onto the patio. From the patio Gerald could see into the master bedroom. He saw Melody lying on their bed, but he could only see her from the waist down. Gerald noticed that Melody's hands were tied behind her back, her feet were hanging off the end of the bed, and he saw something laying on the floor that looked like an intestine. Gerald then ran back to the phone in the house, called his secretary and told her to get an ambulance to his house as fast as possible. Gerald then went outside and waited for his two friends, George Fiddler and Butch Scott, to arrive.

When George and Butch arrived at the Bolton residence, they went directly into the master bedroom to check on Melody while Gerald waited in the kitchen, but they immediately came back out of the bedroom. George saw that Melody had apparently been shot and told Gerald that he did not know if Melody was going to be all right.

McLennan County Sheriff's Deputies Larry Abraham and Ronnie Turnbough secured the Bolton house for investigation. Abraham took pictures of the muddy footprints in the house which ran from the utility room through the kitchen, down the hallway and into each bedroom in the house. Abraham testified that the trail of footprints in the master bedroom went into the closet, around the bed and up to the nightstand.

At trial, the State produced the following chronology of events as narrated by civilian and police witnesses: Betty Birdwell, a Hillsboro resident, testified that on the morning of December 10, 1985, at about 9:00 or 9:30 a.m., two men stopped at her home to look at a Corvette which was for sale in her front yard. The two men were driving a small light colored pick-up truck with a camper on it. The older of the two men, who Betty later identified as appellant, told her that he had just finished paying for the truck but that "the kid wanted a car". Betty also later identified "the kid" as appellant's cohort Ernest Moore.

At 10:20 or 10:30 a.m. on December 10, 1985, Mary Frances Kolar, who lived one or two miles from the Boltons, saw a small red and white pick-up truck with a camper on it come down her driveway, stop, and then back out of her driveway. She noticed two persons were in the truck but they did not drive close enough to the house for her to identify them. Two other witnesses, Laura Fry and Molly Brenner, testified to seeing a small pick-up truck in front of the Bolton residence on the morning of December 10, 1985. Fry stated that she passed the Bolton residence on her way to the grocery store. She saw a small red pick-up truck with a white camper turn into the Bolton's driveway at about 10:30 that morning. Benner also saw a red and white pick-up truck with a white camper when she passed by the Bolton's house at 10:40 a.m. She stated that Melody's car was in the garage and that the pick-up truck was parked close behind it.

In the afternoon of December 10, 1985, Becky Ray and Sonya Baker were approached, according to their testimony, by two men while commercially cleaning a home located south of Athens. The men were in a small red pick-up truck with a white camper. Both Ray and Baker identified appellant as one of the men, and Baker further stated that appellant was the one driving the pick-up. She also identified Ernest Moore. Baker stated that appellant was wearing blue jeans and a plaid western shirt and Moore was wearing blue jeans and a white t-shirt. The men were wearing boots and high-top tennis shoes, but Baker could not recall which man was wearing which type of shoe. After talking to Ray and Baker for approximately twenty or thirty minutes, the two men drove to the house next door. Moments later, Baker saw the Cadillac parked next door "jump" a bar ditch and head out into the pasture. Baker could not see who was driving the Cadillac but she noticed appellant was driving the pick-up and the Cadillac was following it.

Back in August of 1985 Pamela Goddard and her husband Richard rented the trailer behind their home to appellant, his wife

and their four children. Appellant did work for Richard in exchange for free rent until October when appellant was to begin paying rent to the Goddards, but he never did. Appellant and his family were living in the trailer on December 10, 1985. Both Pamela and Richard identified a small red Ford Courier pick-up truck with a white camper as their own. The Goddards testified that appellant drove the truck because he was buying it from them, although after an initial down payment, appellant never made the monthly payments. The title to the truck and the insurance therefore remained in the Goddards' names. Appellant was given two keys to the truck, one of which was copper or brass. Richard testified that the last time he saw that key was when he gave it to appellant.

On the night of December 10, 1985, the Goddards received a phone call from Donna Belyeu, appellant's wife. Donna had found a box of ammunition in the trailer. Appellant was not home at the time of Donna's call so Pamela and Richard went over to the trailer. They found the box of ammunition, which Richard took with him, and the butt of a shotgun. The Goddards then took Donna and her children into their home and called the police; everyone laid on the floor while waiting for the police. Apparently during this waiting period (the record does not clearly develop this point), appellant and Moore returned to the trailer, left in the truck for a short while and then again returned to the trailer. Tammy Goddard testified to hearing the truck leave while she was lying on the floor in her home with her parents and the Belyeu family.

In the meantime, the Sheriff's Department had begun a surveillance for the Ford Courier. Deputy Sheriff Larry Hall of the Johnson County Sheriff's Department discovered some narrow tire tracks on a gravel road in the Cleburne area and noticed footprints on both sides of the tracks. Before Hall could search the area, he received a call that appellant was back at the trailer and his assistance was needed in securing that area. Thereafter appellant and Moore were arrested at the trailer.

Both Donna Belyeu and Richard Goddard gave their consent to a search of the truck; Donna also consented to a search of the trailer. The search of the trailer produced a sawed-off shotgun barrel, a sawed-off shotgun stock, muddy white high-top tennis shoes, and a set of keys to the Ford Courier. The search of the truck revealed a knife with a large amount of blood on the blade inside a buck case, a jeans jacket, and a vest with five shotgun shells in the pocket. The next day, December 11, 1985, Hall returned to the area where he had seen the tire tracks and searched the fenced-in area north of the road. Hall discovered some gun bags, a pine jewelry box, and a sawed-off shotgun. In Hall's opinion, there were blood splatters and brain fragments all over this gun. He also identified a brass key to the Ford Courier which was found in the pine jewelry box. Johnny Liendo, a Peace Officer with the McLennan County Sheriff's Office, testified to finding three other guns in this field and shotgun shells in the jewelry box. The shells in the sawed-off shotgun were the same as the shells loaded in the other shotgun recovered in this field.

Forensic Serologist Patricia Bacha performed tests on the evidence seized. She determined there was blood on the sawed-off shotgun but there was not enough blood to determine whether it was human blood. Human blood was detected on the jeans jacket, appellant's blue jeans and the buck knife. There was insufficient blood on the jacket and jeans to type it; however, the blood on the knife was ABO Type A blood. Both appellant and the deceased have ABO Type A blood. Bacha also detected ABO Type A blood on Moore's jeans, but there was no blood found on either the high top tennis shoes or the boots.

Blood splatter and stain analyses were also done. After being qualified as an expert in this area, Sergeant Rod Englert testified the sawed-off shotgun was consistent with the type of weapon that caused the high velocity mist blood splatter pattern found on the walls of the Boltons' master bedroom. He also determined that the blood splatter pattern on the blue jeans jacket was consistent with the pattern

throughout the master bedroom. The same was true as to appellant's blue jeans. Englert concluded that the blood splatters on appellant's blue jeans, as opposed to those on Moore's blue jeans, were consistent with the blood splatters on the blue jeans jacket.

A firearms examiner determined that pellets taken from Melody Bolton's body were consistent with the shotgun shells found in the sawed-off shotgun. The examiner also determined that the shotgun barrel and stock found in appellant's trailer were consistent with those that would have originally been on the sawed-off shotgun discovered in the field. The autopsy of Melody Bolton revealed that she had died of a shotgun blast to the head and multiple stab wounds to her back. The buck knife found in the Ford Courier was consistent with the stab wounds on the deceased, according to the medical examiner.

McLennan County Sheriff's Deputy Ronnie Turnbough photographed the footprints in the house. In his opinion the footprint near the bed appeared to be made by a tennis shoe, and this same type footprint was seen throughout the house. James Ebert, an archeologist, anthropologist and photogramatist, made comparisons using the high-top tennis shoes, the footprint photographs, and ink impressions from the shoes. Ebert concluded that the footprints on the tile and carpet in the Bolton home were all made from the same kind of shoe and that, in his opinion, there was no likelihood that the footprint on the tile was made by any shoe other than the left high-top tennis shoe discovered in appellant's trailer. There was earlier testimony that Gerald Bolton, George Fiddler, and Butch Scott were wearing leather-soled shoes when they discovered the deceased.

On recall by the State, Gerald Bolton identified as his the three guns which were found in the field by Larry Hall. Bolton kept all three guns in the garage cabinet, but on December 10, 1985, the cabinet was open and the guns were missing. Bolton also identified the box of shotgun shells taken from appellant's trailer. He further testified that the hunting vest and the buck knife that were found in the Ford Courier belonged to him, but he had not seen the buck knife since the day of his wife's murder. The pine jewelry box was identified as the deceased's, and Bolton stated that she kept this box in their bedroom. Bolton did not recognize the key to the Ford Courier which was found in the jewelry box.

The trial court applied the law of parties to the facts of this case in the jury charge. We determine the jury's guilty verdict is a rational finding. The evidence, when taken as a whole, would not support an inference other than that appellant, either acting alone or as a party, committed this offense. The evidence, albeit circumstantial, is sufficient to sustain appellant's conviction. Therefore, appellant's fourth point of error is overruled.

In his first point of error, appellant contends the trial court erred by failing to instruct the jury at the punishment phase that the law of parties, V.T.C.A., Penal Code §§ 7.01 and 7.02, is not applicable to the punishment phase of a capital murder trial. Appellant relies on a footnote in *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985), and our subsequent discussion of that footnote in *Marquez v. State*, 725 S.W.2d 217 (Tex.Cr. App.1987), in arguing that a jury instruction on the law of parties is required if requested by a defendant at trial. The footnote in *Green* states:

> Upon request by a capital murder defendant or the State, the jury is to be instructed at the punishment phase that only the conduct of the defendant can be considered at the punishment phase, and that the instructions pertaining to the law of parties given at the guilt stage cannot be considered ...

*Green,* at 287, n. 4.

At the guilt/innocence phase of appellant's trial, the trial court instructed the jury on the law of parties and authorized conviction of appellant if the jury found he acted either alone or as a party with Moore in the commission of the alleged offense. The jury charge at the punishment stage of trial did not contain an instruction that this

charge could not be considered during punishment. Appellant asserts that he requested such an instruction, but the record indicates that appellant only objected to the failure of the charge to include this instruction. Appellant's objection to the charge at punishment in this cause was as follows:

> The Defendant objects to the Charge as a whole and in particular to that part of the Charge concerning the issue in the abstract as well as in the special issue submission that the conduct of the Defendant that caused the death of the deceased was committed deliberately and with a reasonable expectation that the death of the deceased or another would result, and says that the same is insufficient both in the abstract and in the special issue at law for the reason that the Court fails to instruct the jury in the abstract and in the special issue instructions that only the conduct of the Defendant can be considered in determining the answer to said issue, and that the instructions pertaining to the law of parties as given at the guilt/innocence phase cannot be considered.

Appellant made the same objection as to the second special issue submitted under Art. 37.071, V.A.C.C.P. The trial judge overruled both objections.

Appellant's objections to the charge were sufficient to apprise the trial judge of the instruction that he wanted in the charge to the jury. *Black v. State*, 723 S.W.2d 674 (Tex.Cr.App.1986). It is not necessary for appellant to submit in writing a specially requested jury instruction to apprise the trial court of the charge he wants or to preserve error. Art. 36.14, V.A.C.C.P. For reasons given ante, this objection is sufficient to preserve this point of error for review.

■ In *Marquez*, the appellant argued that an instruction limiting the jury's consideration of punishment evidence to acts specifically shown to have been committed by him was mandated by *Green* because the State failed to prove in his case that he had actually fired the shots that killed the victim. We disagreed, stating:

The Court in *Green* simply forbade the giving of an instruction on the law of parties at the punishment phase of a capital murder case. However, in cases where a law of parties charge was given during the guilt/innocence phase of a capital case a prophylactic instruction should be given, if requested, which would instruct the jury to limit its consideration of punishment evidence to conduct shown to have been committed by the defendant. *Green* at 287, n. 4. The context within which these rules were stated makes it abundantly clear that the Court was talking about the facts of the case itself. The Court was addressing the problem of sentencing a person to death who may have only been a party to the capital murder offense itself.

Paraphrasing *Green*, we therefore gratuitously stated that in cases where a law of parties charge is given during the guilt/innocence phase of a capital case a prophylactic instruction should be given, if requested, which would instruct the jury to limit its consideration of punishment evidence to conduct shown to have been committed by the defendant. *Marquez* at 225.

Recently we were presented with the argument that this language in *Green* (and *Marquez*) requires the trial judge to instruct the jury that the law of parties does not apply at punishment if that instruction is requested and if a charge on the law of parties was given to the jury at the guilt stage. See *Cuevas v. State*, 742 S.W.2d 331 (Tex.Cr.App.1987), and *Nichols v. State*, 754 S.W.2d 185 (Tex.Cr.App.1988). In *Cuevas*, we said the substance of the *Green* footnote was dictum because the defendant in *Green* made no request for an instruction. Even though the defendant in *Cuevas* timely requested the instruction at the punishment phase, we left open the question of whether we should affirm the *Green* footnote as an accurate statement of the law because even if the failure to give the instruction was error, it was harmless error based on the facts of the case. The appellant in *Nichols* seized upon the *Green* footnote and advanced the same argument that appellant in the present cause now makes. In *Nichols* at 199, we held that,

absent an objection or request, an "anti-parties" charge is not required by *Green, Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), or by any state statute. We reiterated, however, that such a charge *should be* given when requested.

▬ We do have a serious concern in this area, as we stated in *Marquez.* In a death penalty case where the law of parties is applicable at the guilt/innocence stage, we are concerned that a jury may decide to affirmatively answer special issue number one, "that the conduct of the defendant that caused the death of the deceased was committed deliberately and with a reasonable expectation that death ... would result", NOT because of any deliberate conduct of the defendant himself, but because of the deliberate conduct of another for whom the defendant was criminally responsible as a party. It is with this concern that we have admonished that an "anti-parties" charge should be given in situations such as the case at bar. In other words, the "anti-parties" charge is a vehicle to guide juries, and if a jury might be misled in answering special issue number one without it, then it is error not to give such a charge. Whether a jury will be so misled, however, must be determined on a case by case basis, considering, among other things, the entire charge and the facts of the case. Therefore, even though the preferred practice is to give an anti-parties charge, a blanket rule that each time a charge on the law of parties is given at the guilt/innocence stage of a capital murder case an "anti-parties" charge *must* be given on request at the punishment stage (or charge error results), is inappropriate.

It is helpful at this juncture to remember that the non-triggerman, that is, the co-defendant who does not actually do the shooting, stabbing, bludgeoning, etc., can him-self deliberately engage in conduct that causes the death of the deceased by acting deliberately and with a reasonable expectation that death can result, and can do so specifically not as a party.[2]

In *Rector v. State,* 738 S.W.2d 235 (Tex. Cr.App.1986), the defendant was indicted along with two others in the death of a young Austin woman. The evidence convicting him was circumstantial, and there was no direct evidence that he himself fired the fatal shot that caused the death of the deceased. In dealing with a challenge to the sufficiency of the evidence relative to special issue number one, the Court reiterated that the law of parties may not be applied to the three special issues:

> That is, the State may not rely on evidence that another with whom the defendant was acting acted deliberately and with a reasonable expectation that death would result.... *The jury must determine whether appellant's own culpable conduct which contributed to the deceased's death was committed deliberately and with the reasonable expectation that death would result.* [citations omitted] (emphasis supplied).

*Rector* at 241. Still, there was ample evidence in *Rector* that the defendant deliberately caused the death of the deceased. There was a two hour robbery/kidnapping/sexual assault that culminated in the victim's death at the hands of one of the co-defendants, circumstantially the defendant. Because the evidence supported only a theory that he was continually involved in the crime from beginning to end and because the defendant had much longer than a moment to consider the likely result of his conduct, the evidence supported the jury's "yes" answer to special issue number one.

In *Green,* where the deceased was killed during a burglary of his home, the defen-

---

**2.** Under the decisions in *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result ..." and "... we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison,* 107 S.Ct. at 1688.

dant did not actually shoot the deceased but armed himself, participated in the burglary, struggled with the deceased and called for help from his co-defendant who then shot the deceased. Such conduct on the part of the defendant was deliberate conduct that was reasonably expected to and did cause the death of the deceased. As pointed out in *Green,* deliberate conduct is an act composed in part of "the moment of deliberation and the determination on the part of the actor to kill", *Rector* at 242, but such conduct can certainly be committed by the non-triggerman in a given fact situation.

■ So, taking care not to involve the law of parties at all, where there are dual actors in a capital murder crime and the State seeks to prove that each committed conduct that caused the death of the deceased and that the conduct of each was committed deliberately and with a reasonable expectation that death would result, even if the undisputed proof shows that only one pulled the trigger, stabbed with the knife or bludgeoned with the club, we recognize that each actor can engage in deliberate conduct as contemplated by special issue number one.

Returning to the correctness of a court's charge, in answering special issue one the important thing is that the court's charge, taken as a whole and considered in light of the evidence in the case, not mislead the jury away from their duty under the law to determine whether appellant's *own* culpable conduct which contributed to the deceased's death was committed deliberately and with the reasonable expectation that death would result. If an "anti-parties" charge is necessary to ensure such a result, then it is error not to give it.

In the case at bar, the special issues submitted to the jury at punishment and the entire charge at punishment focused only on the "conduct of the defendant", whereas the charge at guilt/innocence applied the law of parties to the facts of the case, specifically naming appellant and his

cohort Ernest Moore. We find, after examining the charge, that it is in all ways like the charge in *Cuevas.*[3] That is, the charge in the guilt stage is so specific in applying the law of parties to the facts of the case in the application paragraph that we find no danger that the jury was misled in the manner prohibited in our discussion, infra, in determining its answers to the special issues at the punishment stage. Thus, the anti-parties charge was not necessary and the trial court did not err in refusing to submit such instruction to the jury.

■ Moreover, even if failure to include the anti-parties charge were error in this case, we conclude that such error was not reversible. Our conclusion stems from the following analysis: A harmless error determination is most often conducted pursuant to Tex.R.App.Proc. 81(b)(2). Recently we devoted a great deal of thought to just how such an analysis should be conducted once this Court has determined the trial court erred. In *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989), we thoroughly discussed and elucidated the principles an appellate court should follow when deciding whether an error constitutes reversible error. The first focus of this Court when engaging in this 81(b)(2) analysis is the error. We first isolate the error and its effects. To do this procedure, we look at the source and nature of the error committed. The effects of the error will depend upon the facts of the case *sub judice,* the type of error, and the emphasis placed on the error by the State. We must look at the impact, if any, the error may have had on the jurors' deliberations, i.e. the weight the jurors have given the error. The effect of the error must be viewed, however, not in isolation but in light of all the other evidence admitted during trial. It is not determinative that there is overwhelming evidence of appellant's guilt or that we believe the trier of fact reached the correct verdict; we must bear in mind that we are calculating, to the extent possible, the effect or impact the error had on the jury.

---

**3.** We recognize, as pointed out in J. Clinton's dissenting opinion, that the *Cuevas* charge differed in respect to the conspiracy wording of

7.02(b); but in the sense of specifically applying the law to the facts the two charges contain detailed specificity.

Thus, the second focus involves questions to be answered by this Court such as whether a rational trier of fact would have reached a different result without the error and its effects, whether the error impacted the other evidence at trial positively or negatively, etc.

However, not all trial court error is subject to an analysis under R. 81(b)(2). Jury charge error is sometimes subject to a harm analysis under *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1984) (Opinion on State's Motion for Rehearing). As stated in *Beathard v. State*, 767 S.W.2d 423 (Tex. Cr.App.1989):

> "Normally, because this is an instance of charging error with timely objection, we would apply the "some harm" test set out in *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985); c.f. *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1988). However, the Supreme Court has stated, "The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law." *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967). When an error implicates rights flowing from the United States Constitution, we must apply the harmless-error rule enunciated by the Supreme Court. Id. Before a "federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24, 87 S.Ct. at 828. This is the same standard imposed by our general harmless-error rule. Tex.R.App. Pro. 81(b)(2)."

Thus the threshold question to answer in deciding which harm analysis to utilize in a jury charge error situation, the analysis under *Almanza* or the analysis under 81(b)(2), is: Does the error implicate rights flowing from the United States Constitution?

In *Cuevas*, supra, we answered that question as far as the issue in this case is concerned:

> "We do not reach the issue of federal harmless error analysis, because the Texas statute does not suffer from the claimed constitutional defect. For the reasons given below, we hold that the instruction requested by appellant [an anti-parties charge in the punishment charge to the jury] is not required by the United States Constitution."

*Cuevas*, supra, at 350. Thus we proceed with the harm analysis under *Almanza*, specifically the "some harm" analysis since there was a trial objection to the complained of error.

> "The degree of actual harm [in an *Almanza* 'some harm' analysis] must be assayed in light of the entire jury charge, the state of the evidence including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed in the record. Almanza, supra, at 171."

*Cuevas*, supra, at 351.

In *LaPoint v. State*, 750 S.W.2d 180, 190 (Tex.Cr.App.1986) (Opinion On State's Motion For Rehearing), we had the opportunity to further discuss and apply the *Almanza* "some" harm analysis. In *LaPoint*, at 191, we noted it is the defendant's burden under Art. 36.19, V.A.C.C.P., to persuade the reviewing court that he suffered *some actual harm* as a consequence of the charging error. If the defendant is unable to do so, the charging error will not result in a reversal of the conviction. In making this determination, we stated:

> Under *Almanza*, supra, we examine the entire record of trial to determine whether appellant might have been acquitted, convicted of a lesser offense, assessed a more lenient punishment, or advantaged in some other significant manner, had the trial judge omitted from his jury charge the erroneous instruction ...

In this cause, we will engage in this analysis to see if appellant suffered some actual harm by the trial court's refusal to include the anti-parties instruction in the jury charge.

First we recognize that in any murder situation in which there is one victim but two perpetrators, as in the present case, and there is no witness to testify who actually executed the victim, the jury might speculate on who was the actual trigger-

man in its deliberations at punishment. It is possible in the case *sub judice* that the jury might have remembered the parties charge given at guilt/innocence which authorized appellant's conviction whether he was the triggerman or not and considered that at punishment. Even if the jury believed appellant's cohort Moore was the triggerman, the jury may have considered his (Moore's) deliberate conduct in answering issue one regarding appellant's conduct. This is mere speculation on our part, however, and we must therefore review the actual events and facts of the trial to determine whether this mere speculation in reality amounted to some harm.

The record in this case reveals the following: The jurors were of course voir dired on the applicability of the three issues under Art. 37.071(b), but the prosecutor did not improperly inform the prospective jurors that they could consider the conduct of appellant's cohort when answering the issues at punishment in appellant's trial. The evidence introduced during guilt/innocence showed the conduct of both the appellant and Moore was deliberate. Relative to deliberate conduct causing the death of the victim, the evidence, outlined earlier, revealed a cold-blooded execution and robbery dually carried out by appellant and his cohort. There was evidence that the blood splatters on appellant's clothing were more consistent with him being the triggerman but that evidence, although persuasive, was not conclusive. Several witnesses who encountered appellant and Moore prior to the commission of this offense testified appellant appeared to be the one "in charge." During jury argument at the punishment stage, the prosecutors limited their comments to the actions of appellant during commission of the offense, his prior bad acts, and his family life. In one instance, the district attorney did argue that "Whether Ernest Moore pulled the trigger, whether [appellant] pulled the trigger makes no difference. The conduct (of

appellant) was deliberate." But as discussed earlier, under the facts of this case this is a correct statement of the law in "non-triggerman" cases under *Green* and *Rector*. The prosecutor did not ask the jury to consider Moore's conduct or the deliberateness thereof when answering the punishment issues. In defense counsel's argument he reminded the jury they had convicted appellant under the law of parties and told them, just as the jury in *Cuevas* was told, that the law of parties was not involved in the punishment phase. Defense counsel reiterated numerous times in his jury argument that the evidence was inconclusive as to who pulled the trigger and was, in the theory of the defense, ultimately responsible for killing Melody Bolton. Thus the jury was directed by both the State and defense to consider only appellant's conduct and mental state in the commission of this offense. The instructions in the court's charge were proper and, as noted earlier in this opinion, were phrased only in terms of appellant's conduct. A note from the jury during punishment deliberations asked to review appellant's pen packet, the blood splatter expert's testimony, and the autopsy report which indicates the jury was focusing on appellant's personal history and involvement in the commission of the murder. From all these circumstances and facts of trial, we find and hold that appellant did not suffer some actual harm from the omission of the anti-parties charge in the court's charge on punishment. Appellant's first point of error is overruled.[4]

In appellant's second point of error he contends the trial court erred in failing to define the word "deliberately" in the charge to the jury at punishment. Appellant objected to this omission and requested an instruction to be given regarding the definition of said word. Appellant acknowledges that we have repeatedly held

---

4. Appellant complains of the effect of the lack of an anti-parties charge on the jury's answer to special issue number two, also. He does not argue how such a charge might mislead the jury in answering "whether there is a probability that the defendant would commit criminal acts

of violence that would constitute a continuing threat to society". Art. 37.071(b)(2) V.A.C.C.P. Under the analysis above, we do not believe that the jury might have been misled into considering his cohort's actions in answering this question. Thus no error is presented.

that the trial court need not define the word "deliberately" in its punishment charge, but he urges us to reconsider that holding. We have recently confronted this issue and continue to adhere to our holding that it is not error for the trial court to fail to define "deliberately" upon objection by a defendant to the jury charge at punishment. *Tucker v. State*, 771 S.W.2d 523 (Tex.Cr.App.1988), *Fearance v. State*, 771 S.W.2d 486 (Tex.Cr.App.1988), *Purtell v. State*, 761 S.W.2d 360 (Tex.Cr.App.1988), *Demouchette v. State*, 731 S.W.2d 75 (Tex. Cr.App.1986), cert. denied 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Appellant's point of error is overruled.

■■■ Appellant argues in his third point of error that Art. 37.071, V.A.C.C.P., our capital sentencing scheme, is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution and under Art. 1, Sec. 13 of the Texas Constitution. Appellant does not challenge the constitutionality of Art. 37.071, supra, *as applied to him*. The gist of appellant's argument is that the jury is not given any guidance by the trial court as to what consideration should be given mitigating evidence offered at punishment. Appellant does not contend that he requested any charge on the use of mitigating evidence or that he objected to the absence of such a charge.

Appellant also states in his third point of error that this Court has narrowly restricted the scope of admissible punishment evidence on the second special issue under Art. 37.071, supra, dealing with a defendant's future dangerousness. Appellant was, however, allowed to offer mitigating evidence at the punishment stage, and he does not complain that he was denied the opportunity to offer any additional mitigating evidence. Appellant cites *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978), cert. denied 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979), in support of this claim and offers no other argument as to why our statute is unconstitutional under state law.

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court held our capital sentencing procedure, Art. 37.071, supra, did not violate the Eighth and Fourteenth Amendments to the United States Constitution. The Supreme Court concluded:

> By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function.

96 S.Ct. at 2958. See also *Esquivel v. McCotter*, 777 F.2d 956 (5th Cir.1985), rehearing denied 779 F.2d 682, (5th Cir.1985) cert. denied, 475 U.S. 1132, 106 S.Ct. 1662, 90 L.Ed.2d 204.

As to appellant's state constitutional claim, we have held our procedure for imposition of the death penalty upon conviction of capital murder is not unconstitutional. *Phillips v. State*, 701 S.W.2d 875 (Tex. Cr.App.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574. See also *Adams v. State*, 577 S.W.2d 717 (Tex.Cr. App.1979), reversed on other grounds, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581, (1980) on remand, 624 S.W.2d 568 (Tex.Cr. App.1981).

Appellant's contention under *Hovila* is also meritless. Article 37.071, supra, assures that *relevant* information relating to the defendant may be introduced in evidence. *Jurek v. Texas*. In *Hovila*, we noted that the trial judge has broad discretion under Art. 37.071, supra, in determining what constitutes relevant evidence, but we did not narrow the scope of admissible punishment evidence. See e.g. *Burns v. State*, 761 S.W.2d 353 (Tex.Cr.App.1988). Appellant's third point of error is overruled.

■■■ In his fifth point of error, appellant contends the death penalty is cruel and unusual punishment and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution. This contention is without merit. *Jurek v. Texas; Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981).

See also *Penry v. Lynaugh*, — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). This point of error is overruled.

Accordingly, the judgment of the trial court is affirmed.

TEAGUE, J., dissents.

CLINTON, Judge, dissenting.

As in *Webb v. State*, 760 S.W.2d 263 (Tex.Cr.App.1988), appellant in this cause could have been convicted, on the evidence as summarized by the majority opinion today, either as a primary actor or as a party to the intentional killing of the deceased. Since the Court's opinion in *Green v. State*, 682 S.W.2d 271, 287 (Tex.Cr.App.1984), adopted the concurring opinion in *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr.App.1983), it has been held that the law of parties does not apply at the punishment phase of a capital murder prosecution. What this means is that a jury that believes the accused acted as a party to the commission of the actual killing, under V.T.C.A. Penal Code, § 7.02(a)(2), may not focus upon the conduct of the primary actor as circumstantial evidence to establish that Article 37.-071, (b)(1), V.A.C.C.P., ought to be answered affirmatively as to the accused. In assessing whether it believes beyond a reasonable doubt he acted "deliberately and with the reasonable expectation that ... death ... would result[,]" a jury that found the accused acted as a party must focus, instead, upon the accused's own conduct by which he "solicited, encouraged, directed, aided or attempted to aid" perpetration of the intentional murder. *Webb v. State*, supra at 267; *Meanes v. State*, supra at 375–76; *Martinez v. State*, 763 S.W.2d 413, 420, n. 5 (Tex.Cr.App.1988). Unfortunately, because the jury's verdict at the guilt phase of a capital murder trial is general, by operation of Article 37.07, § 1(a), V.A.C.C.P., it is impossible to discern upon which theory of guilt, primary actor or party, a jury that has been instructed it may convict the accused under either, has actually proceeded.

Article 37.071(b)(1), supra, requires the jury to find deliberateness, *vel non*, of "the conduct of the defendant that caused the death of the deceased...." On its face this language appears to mandate a finding that the defendant's own conduct directly caused the death of the deceased. Under this Court's construction of the statute, however, it is not necessary that the defendant's conduct have been the direct cause of the death in order to support an affirmative answer to special issue one. It need only be found that the conduct by which he solicited, encouraged, directed, aided or attempted to aid another in commission of the killing was "committed deliberately and with the reasonable expectation that ... death ... would result." *Webb v. State*, supra; *Meanes v. State*, supra. Unfortunately, with only the facial language of the statute before it, a jury might well believe it must find the accused's own conduct literally "caused the death." A jury that earlier found the accused guilty only vicariously of the conduct that directly caused the death may believe the only way it can answer special issue one affirmatively is likewise to find "deliberateness" of the accused vicariously, through his accomplice.

Under these circumstances it would be useful, to say the least, to inform the jury for purposes of its punishment deliberations that if it found it was the accused's accomplice who committed the act directly causing death, it must not rely on that act to establish deliberateness of the accused. This is what the so-called "anti-parties" charge is designed to do. While failure of the trial court *sua sponte* to include the "anti-parties" charge has been held not to amount to fundamental constitutional error, e.g., *Nichols v. State*, 754 S.W.2d 185, 199 (Tex.Cr.App.1988); *Skillern v. Estelle*, 720 F.2d 839, 847–49 (CA5 1983), surely inclusion of such a charge facilitates a proper understanding of how to measure an accused found guilty as a party against the standard of Article 37.071(b)(1), supra. This but accomplishes the legislative objective that the court's charge "distinctly set[ ] forth the law applicable to the case[.]" Article 36.14, V.A.C.C.P. Upon request, such an instruction should be given, as the Court has suggested, if not held, on a number of occasions. *Green v. State*,

supra at 287, n. 4; *Marquez v. State,* 725 S.W.2d 217, 225 (Tex.Cr.App.1987); *Nichols v. State,* supra, at 198–99.

Squarely confronted with the issue in *Cuevas v. State,* 742 S.W.2d 331, 351 (Tex.Cr.App.1987), the Court dodged the question of whether error was presented by concluding that any error was harmless, under *Arline v. State,* 721 S.W.2d 348 (Tex.Cr.App.1986) and *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985). Today the Court does address the question of whether error is presented. (However it incorrectly characterizes this charge as "in all ways like the charge given in *Cuevas,*" at p. 74; compare pattern charge under § 7.02(a)(2) with basic emphasis on "conspiracy" under § 7.02(b) in *Cuevas,* supra, at 352.) For reasons reminiscent of those upon which the Court in *Cuevas* found no harm, the majority finds no error in the denial of appellant's requested instruction. I cannot join in such legerdemain.

The majority opines, first, that whether to give a requested "anti-parties" charge will constitute error "must be decided on a case by case basis, considering, among other things, the entire charge and the facts of the case." At p. 73. This sounds not so vaguely like the criteria expressed in *Almanza v. State,* supra, at 171, for determining both "egregious" and "any," nee "some" harm, see *Arline v. State,* supra, wrought by established error in the court's charge. Indeed, the very criteria the majority now says should inform our decision whether error has occurred were essentially those utilized by the Court in *Cuevas* to avoid the question whether error has occurred! *Id.,* at 351.

When it comes to applying these criteria, the majority next observes that "the special issues submitted to the jury at punishment and the entire charge at punishment focused only on the 'conduct of the defendant,' whereas the charge at guilt/innocence applied the law of parties to the facts of the case, specifically naming appel-

lant and his cohort...." At p. 74. On this basis the majority finds the "anti-parties" charge was "not necessary." *Id.* This is no more than to say, however, that as long as the instruction given at the guilt phase of trial on the law of parties, under § 7.02, supra, and the submission of the first special issue in the punishment charge, were both proper, there is no need for an "anti-parties" charge. In other words, as long as the jury charge otherwise adequately sets out "the law applicable to the case[,]" an "anti-parties" charge is redundant. This analysis begs the question and effectively denies any utility of an "anti-parties" charge altogether. Moreover, it is completely at odds with the majority's purported case by case approach. Most cases will present charges that properly apply the law of parties to the facts at the guilt phase, and that track the language of Article 37.071(b)(1), supra, at the punishment phase. But the whole problem is that the plain language of Article 37.071(b)(1), supra, does not explicitly disabuse the jury of the notion of vicarious responsibility that has been endorsed and commended to it in the guilt charge.

After thus finding no error was committed, the majority nevertheless duplicates its efforts by inquiring whether appellant was harmed.* A familiar epithet, "cold blooded execution," is invoked to characterize the offense, as if severity of the crime had some bearing on the question. At p. 76. We are told it was "dually carried out by appellant and his cohort." *Id.* Of course it is that circumstance, aggravated by the fact that the evidence "was inconclusive as to who pulled the trigger," *id.,* that creates the need for an "anti-parties" charge in the first place. It is true that neither counsel for the State nor for appellant affirmatively misled the jury in punishment argument, and that appellant's counsel was allowed to argue unmolested that the law of parties does not apply to the punishment phase of trial. On this state of the record I could

---

* In gratuitous dicta the majority would substitute a harm analysis under Rule 81(b)(2) for one under *Almanza* where charge error "implicates rights flowing from the United States Constitution," at 75. That notion is contrary to teach-

ings of *Rose v. State,* 752 S.W.2d 529, at 537, n. 9, and 553 (Tex.Cr.App.1987); it also introduces serious questions concerning authority granted this Court by predecessor to Government Code § 22.108.

agree that "egregious" harm did not accrue. But to hold in a case such as this that jury argument may effectively replace a requested instruction of law from the trial court that the jury must focus on appellant's own conduct in assessing his deliberateness is once again to deny the utility of an "anti-parties" instruction at all. Such a conclusion further blurs whatever distinction remains between "egregious" harm and "some" harm under *Almanza v. State,* supra.

I respectfully dissent.